Filed 12/22/22  P. v. Moran CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JUNIOR ANTONIO MORAN,<br><br>     Defendant and Appellant. | A165847<br><br>(Kern County<br>Super. Ct. No. BF172582A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

The order of December 19, 2022 modifying the opinion filed on November 23, 2022 and denying rehearing is stricken.

It is ordered that the opinion filed on November 23, 2022 be modified as follows:

The paragraph beginning on the second to the last line on page 36, beginning with the sentence, "This case is materially different," and ending on page 37 with the sentence, "Thus, unlike in *Velasquez*, the potential for juror confusion from CALCRIM No. 875, as given, was not 'obvious.' (*Velasquez*, *supra*, 211 Cal.App.4th at p. 1176)," is stricken.

In its place, the following paragraph is inserted:

1

"This case is materially different. Unlike the circumstances in *Velasquez*, which involved five assault victims with only one of them in the area of the shooting, here, both Jacqueline *and* the child were in the area. Defendant pointed a loaded gun at Jacqueline's head while she was sitting next to him on the living room couch and holding their daughter in her arms. To the extent defendant suggests evidence of his specific intent to injure his daughter was required to sustain the assault charge, he is mistaken. '[A]ssault does not require the specific "intent to cause any particular injury to severely injure another . . . ." Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' (*People v. Williams* (2001) 26 Cal.4th 779, 790.) Here, even if defendant's daughter may not have been the intended target, defendant knew of facts establishing that his act by its nature would 'probably and directly result in the application of physical force against' his daughter. Thus, unlike in *Velasquez*, the potential for juror confusion from CALCRIM No. 875, as given, was not 'obvious.' (*Velasquez, supra*, 211 Cal.App.4th at p. 1176.)"

This modification does not change the judgment.

The petition for rehearing is denied.


Dated: _____          _____,

Richman, Acting P.J.

2

Filed 12/19/22  P. v. Moran CA1/2 (previously modified opinion)
(unmodified opinion attached)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUNIOR ANTONIO MORAN,<br><br>    Defendant and Appellant. | A165847<br><br>(Kern County<br>Super. Ct. No. BF172582A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on November 23, 2022, be modified as follows:

The last full paragraph on page 36 and continuing onto page 37 is modified to read:

"This case is materially different.  Unlike the circumstances in *Velasquez*, which involved five assault victims with only one of them in the area of the shooting, here, both Jacqueline *and* the child were in the area. Defendant pointed a loaded gun at Jacqueline's head while she was sitting next to him on the living room couch and holding their daughter in her arms, and he admits he did so knowing his daughter was in her arms.  To the

1

extent defendant suggests evidence of his specific intent to injure his daughter was required to sustain the assault charge, he is mistaken. '[A]ssault does not require the specific "intent to cause any particular injury to severely injure another . . . ." Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' (*People v. Williams* (2001) 26 Cal.4th 779, 790.) Here, even if defendant's daughter may not have been the intended target, defendant knew of facts establishing that his act by its nature would 'probably and directly result in the application of physical force against' his daughter. Thus, unlike in *Velasquez*, the potential for juror confusion from CALCRIM No. 875, as given, was not 'obvious.' (*Velasquez, supra*, 211 Cal.App.4th at p. 1176.)"

This modification does not effect a change of the judgment.

The petition for rehearing is denied.

Dated: _____          _____,

Richman, Acting P.J.

Filed 11/23/22  P. v. Moran CA1/2 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUNIOR ANTONIO MORAN,<br><br>Defendant and Appellant. | A165847<br><br>(Kern County<br>Super. Ct. No. BF172582A) |

Defendant Junior Antonio Moran shot his former girlfriend, Jacqueline S., while she was standing next to their young daughter, seriously injuring Jacqueline.[1]  A jury convicted defendant of numerous crimes, with true findings on multiple firearm and other sentence enhancements, for which he was sentenced to a determinate term of 14 years in prison, plus an indeterminate term of 25 years to life.  Among the convictions were one count of attempted murder and three counts of assault with a firearm:  two as to Jacqueline and one as to the daughter.  Defendant challenges his convictions of attempted murder and assault as to his daughter, asserting prosecutorial misconduct, ineffective assistance of counsel, and instructional error.  We conclude that none of defendant's numerous attacks requires reversal, and we affirm.

---

[1] We refer to Jacqueline by her first name only in order to protect her privacy.  For similar reasons, we refer to Jacqueline's and defendant's daughter as the "daughter" or "child."

1

## BACKGROUND

### The Evidence at Trial

Defendant and Jacqueline began dating in January 2016, and their daughter was born in November of that year. They stopped dating at some point before the shooting in this case on June 9, 2018.

Jacqueline testified she suffered abuse at the hands of defendant throughout their relationship. She recounted three separate incidents from 2017. In the first incident, she and defendant got into an argument, during which he grabbed a rifle and pointed it at her head from about ten feet away. In the second incident, defendant cut her with a knife after they got into an argument.

As for the third incident, Jaqueline was dropping off defendant's sister at her residence after they had been hanging out. Defendant, who was at the residence, had been drinking and was upset that Jacqueline was late in dropping off his sister. He went inside Jacqueline's car, and she started driving them towards her parents' house. Defendant then started hitting her on her head and body. At some point later, defendant took over the driver's seat and drove to an orchard. Both got out of the car, and defendant began punching and kicking Jacqueline. She tried to run away, but defendant caught up to her and she fell, at which point he started stomping on her. Jacqueline "was all beat up," left with bruises and red marks.

Jacqueline described that during each incident, defendant would become upset and "would just like flip." And when he was done "flipping" out on her, he would "snap out of [it]" and immediately say "oh, my, God, I'm so sorry." Jacqueline said, "It always happened like that." Jacqueline did not call 911 or report any of the abuse to the police. She also did not tell her family because she did not want them to dislike defendant. Jacqueline

2

"thought everything would be okay because he would always tell me, no, I won't do it anymore . . . . I'm sorry. And it just kept happening until the day he shot me."

On the day of the incident, defendant, who had been spending time with his daughter, brought her back to Jacqueline's apartment, where she lived with Jacqueline and her friend, Alma Morales. Morales was at the apartment when defendant arrived, but left some 45 minutes to an hour later.

After Morales left, defendant and Jacqueline got into several disagreements. The first was when defendant told Jacqueline he wanted a beer. This upset Jacqueline because she did not drink and did not allow drinking in her home. When Jacqueline refused to give defendant money to buy beer, they started arguing. Defendant left the apartment and returned with a bottle of beer. Upset, Jacqueline took her daughter into the bedroom while defendant stayed in the living room listening to music.

Defendant subsequently left the apartment, returned with another bottle of beer, and started drinking it.[2] Defendant also smoked marijuana while he drank either his first or second beer.

At some point later, Jacqueline took her daughter to play outside on the balcony. Defendant remained on the living room couch, listening to music. When this one rap song started playing, defendant sang to Jacqueline the part of the song that talked about "[i]f . . . the girl wasn't going to act right, then he was going to blow her brains out."

When defendant was nearly finished with his second beer, he told Jacqueline to go back inside. She refused, and defendant demanded again

---

[2] Jacqueline testified that one of the bottles contained 40 ounces; however, Morales's testimony and photographs of two bottles found at the apartment indicate that each bottle contained 32 ounces.

3

that she go inside.  They repeated this exchange several times.  Defendant became upset and punched Jacqueline in the face, causing their daughter to scream and cry.  Defendant told Jacqueline to take the child inside because she was loud, but she refused.  He then pinched Jacqueline on her face and pulled her up.  Jacqueline took her daughter inside, and defendant followed.  Defendant was "really mad" and told her she "wanted for everybody to know that he was hitting [her]."

Jacqueline turned on the television to calm down her daughter, who eventually fell asleep in Jacqueline's arms.  Defendant sat down on the couch next to them.  While they were watching television, defendant pulled out a revolver and pointed it at Jacqueline's head.  Jacqueline, still with her daughter in her arms, saw rounds in the cylinder.  Jacqueline told defendant to not act "stupid" and pushed the gun away from her head.  Defendant opened the gun, removed the bullets, put it away, and told Jacqueline that "he was lucky that [her] daughter was there."

After another disagreement about Jacqueline getting up to make the child a bottle, Jacqueline went into the bedroom, which had two beds against one wall and a futon against the opposite wall.  She laid her daughter down on the bed closest to the closet and changed her diaper.

On her way to the bathroom to throw away the diaper, Jacqueline saw defendant in the hallway walking towards the bedroom with the revolver in his hand.  The chamber was open.  Jacqueline "just froze" and walked back to her daughter, who was lying on the edge of the bed closest to the closet.  Jacqueline stood next to her and grabbed her leg.  Defendant walked into the bedroom and sat down on the futon facing both Jacqueline and the child.  He then closed the chamber of the gun and told Jacqueline that they were "going to play a little game," to which she replied, "[N]o, we're not.  We're not going

to play a game." When asked if she was "aware of whether or not there was a bullet in there," Jacqueline testified, "I don't remember . . . . I just know—I remember—yeah, yeah, he did" and that "[h]e had a bullet in there," though she did not know how many.

Defendant, from about eight feet away, pointed the gun at Jacqueline's chest and pulled the trigger. The gun did not fire. Jacqueline told defendant to "stop acting stupid," but he just laughed and repeated, "[Y]ep, yep, we're going to play a little game." He pulled the trigger a second time, and again the gun did not fire.

Jacqueline started crying, let go of her daughter's leg, and walked backwards. Defendant pulled the trigger once more and this time, the gun fired. Jacqueline was struck and fell to the ground. The child immediately stood up and started screaming and running back and forth on the bed.

Jacqueline told defendant she could not breathe and asked him to call 911. Defendant told her to "quit it" and said, "I didn't hit you." Jacqueline insisted she could not breathe and that he call 911. Defendant walked up to Jacqueline, lifted up her shirt, and saw "all the blood coming down." Defendant then said, "[O]h babe, I'm sorry. I'm so sorry." Jacqueline testified that this apology was similar to the apologies he made in connection with the three prior domestic violence incidents in 2017.

Jacqueline saw defendant put the gun to his head, as if he were going to shoot himself, but he did not do so. Jacqueline did not know what defendant did with the gun afterward.

Defendant called 911, but when the operator answered, he hung up the phone. Jacqueline grabbed the phone from defendant and called 911 herself. She told the operator she had been shot, she could not breathe, and she needed help. When Jacqueline said that the paramedics were "coming for

[her]," defendant said, "[O]h no, no, no, no. We got to go." She insisted they had to stay at the apartment and wait for help, but defendant continued to say they "had to go." Defendant then picked up Jacqueline from the ground, who was able to slowly walk. Defendant "kept telling [her] to hurry" and pushed her. Eventually, Jacqueline managed to walk downstairs and get into defendant's car. Defendant got into the car with his daughter and drove towards the hospital.

During the car ride, Jacqueline saw police vehicles driving in the opposite direction towards her apartment. She told defendant to flash his headlights to get the police's attention, but he did not and continued driving. Defendant waited until after the police had passed, made a U-turn, and drove into a McDonald's parking lot where he told Jacqueline to get out of the car. Once she got out, defendant drove off with their daughter.

Kern County Sheriff Deputy Jesse Quiapo arrived at the parking lot and made contact with Jacqueline. Jacqueline told him that defendant had shot her. Eventually, emergency personnel arrived, and Jacqueline was transported to a hospital.

Police located defendant while he was on the road, arrested him, and searched him. Police found two .38 caliber rounds and three .357 rounds in the front pocket of defendant's pants. Police placed the child into the custody of defendant's sister.

Deputy Quiapo interviewed Jacqueline at the hospital. When he asked her if she knew whether the gun was loaded before being shot, Jacqueline stated defendant had put a bullet in the chamber of the gun.

Meanwhile, another Kern County Sheriff's deputy responded to Jacqueline's apartment and authored a search warrant for the apartment. A 32-ounce bottle of beer with some beer left in it was found. A fingerprint

6

lifted from the bottle matched defendant's.

About a week after the shooting, Morales located a gun in a closet in the apartment behind the water heater. Law enforcement retrieved the gun, which had a spent .357 casing in the cylinder. Morales also found an empty 32-ounce bottle of beer and turned it over to police.

Jacqueline was treated for multiple gunshot wounds at the hospital, where she remained for ten days. She sustained wounds to her right upper arm and one wound to her right side. A CT scan revealed she had a collapsed lung with blood around it and a liver laceration, requiring her to undergo surgery.

As of the time of trial, Jacqueline still had the bullet inside her body, and she continued to experience abdominal pain, numbness in her right leg, fingertips, and arm, "really bad headaches," and nightmares about the shooting.

**The Proceedings Below**

On October 30, 2018, an information charged defendant with attempted murder (Pen. Code, §§ 187, subd. (a), 664) (count one)[3]; three counts of assault with a firearm (§ 245, subd. (a)(2)) (counts two and four identifying Jacqueline as the victim, and count three identifying defendant's daughter as the victim); willful infliction of corporal injury resulting in traumatic condition (§ 273.5, subd. (a)) (count five); and felony child endangerment (§ 273a, subd. (a)) (count six).

The information alleged that defendant personally used a firearm in the commission of all the offenses. (§ 12022.5, subd. (a).) As to count one, the information alleged that the attempted murder was willful, deliberated, and premeditated (§ 189), as well as the following enhancements: personal use of

---

[3] Undesignated statutory references are to the Penal Code.

7

a firearm in the commission of a felony (§ 12022.5, subd. (a)); personal use of a firearm in the commission of attempted murder (§ 12022.53, subd. (b)); intentional discharge of a firearm (§ 12022.53, subd. (c)); and infliction of great bodily injury caused by the discharge of a firearm (§ 12022.53, subd. (d)). With respect to counts one, four, and five, the information alleged that defendant inflicted great bodily injury under circumstances involving domestic violence. (§ 12022.7, subd. (e).)

On May 23, 2019, the jury found defendant guilty of all charges. It was unable to reach a finding on the allegation that the attempted murder was willful, deliberate, and premeditated, but it found true all the remaining enhancement allegations.

On September 5, the trial court sentenced defendant to a determinate term of 14 years, plus an indeterminate term of 25 years to life.

Defendant filed a timely appeal.[4]

## DISCUSSION

Defendant raises six arguments in his opening brief, with the first, second, third, fourth, and sixth attacking his attempted murder conviction, and the fifth attacking his conviction of assault with a firearm as charged in count three. We first address the challenges to the attempted murder conviction and then turn to the single challenge to the assault conviction— and ultimately reject them.

### The Prosecutor Did Not Commit Prejudicial Misconduct by Referring to Facts Not in Evidence During Closing Argument

Defendant's first argument challenging his attempted murder conviction is that the prosecutor committed misconduct by referring to facts not in evidence during closing argument.

---

[4] Following briefing, this matter was transferred from the Fifth Appellate District to the First Appellate District by the California Supreme Court's order on August 9, 2022.

### *Additional Background*

As discussed, Jacqueline testified she was involved in three domestic violence incidents with defendant in 2017. Addressing those incidents, the prosecutor in closing argument made the following remarks:

"Ladies and gentlemen, every year the NFL wears purple for a month to support domestic violence, and you have Hollywood actors that get on TV and they talk to you—

"[Defense Counsel]: Objection. Facts not in evidence.

"THE COURT: Sustained.

"[Prosecutor]: About domestic violence. You have images in your mind as to what domestic violence is based on what Hollywood tells you it is. Ladies and gentlemen, this is what domestic violence looks like. This is real domestic violence. It's not the woman who is nearly flawless and is completely perfect and is strong and is independent and happens to get beat one time by a spouse and then takes her strength back and takes her power back and goes off and kills him in some secretive way where she doesn't get caught. That's Hollywood's version of domestic violence.

"Domestic violence, the real thing, is an angry manipulative, controlling, and in this case, man, who on the other end of it has a weak, has a scared, has a dependent woman.

"[Defense Counsel]: Objection. Facts not in evidence.

"THE COURT: Overruled.

"[Prosecutor]: That is what real domestic violence looks like. And that controlling, angry individual takes advantage of that person over and over again. Domestic violence looks like being abused multiple times and not calling law enforcement, not having the strength to tell her family what was going on, being afraid that they would not like him and wanting them to like

9

him, even though he continuously does these types of things to her."

Later in her argument, the prosecutor stated, "This all goes back to what domestic violence really is. She is afraid. She doesn't want her family to know what he's really like. She still loves him, likes him, wants to be with him, wants to make this work because they have a daughter together. So she puts up with it. And she told you that he would regularly apologize afterwards. I'm sorry. I'm never going to do it again. She described it as a switch. He would just snap. That is what domestic violence is like. That's him controlling her, bringing her back in, manipulating her every single time, and it worked."

*Analysis*

Defendant contends the prosecutor's remarks amounted to misconduct because they referred to facts outside the record. Alternatively, defendant argues that trial counsel was ineffective if the issue was not preserved for appeal. We conclude the argument was forfeited, but even were we to address the merits, we would find any misconduct—if misconduct there was—harmless.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"When the issue 'focuses on comments made by the prosecutor before

10

the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]  A prosecutor is given wide latitude during closing argument.  The argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom." (*People v. Harrison* (2005) 35 Cal.4th 208, 244.)

Prosecutorial misconduct will not trigger reversal, however, unless it is shown to be prejudicial.  (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)  Our Supreme Court has held that either of the two traditional tests of prejudice could apply to a particular instance of misconduct.  (*Id.* at p. 214.)  The test of prejudice for violation of state law is whether "it is reasonably probable that a result more favorable to the [defendant] would have been reached in [its] absence." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  " '[I]f federal constitutional error is involved, then the burden shifts to the state 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' (*Chapman v. California* (1967) 386 U.S. 18, 24 [*Chapman*].)" (*People v. Bolton, supra*, 23 Cal.3d at p. 214.)

" ' "As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894 (*Covarrubias*).)

Here, although defense counsel objected to some of the prosecutor's remarks on the ground of facts not in evidence, she did not object on the ground of misconduct.  Nor did counsel ask for the jury to be admonished. Defendant acknowledges these failures, as well as the general rule requiring a defendant to make a timely and specific objection and ask for an

admonition.  (See *Covarrubias*, *supra*, 1 Cal.5th at p. 894.)  He contends, however, that we should excuse his counsel's omissions because any additional objections or an admonition request would have been futile, given that the trial court twice had overruled her objections based on facts in not evidence.

"A defendant will be excused from the requirement of making a timely objection and/or a request for admonition if either would have been futile." (*People v. Cole* (2004) 33 Cal.4th 1158, 1201, citing *People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)  That exception applies in "unusual" or "extreme" circumstances like those in *Hill*, where defense counsel's failure to object was excused by the prosecutor's "continual misconduct, coupled with the trial court's failure to rein in her excesses, [which] created a trial atmosphere so poisonous" that further objections "would have been futile and counterproductive" to the defendant.  (*Id.* at p. 821.)

No such "unusual" or "extreme" circumstances were present here.  The record does not show that the court was quick to dismiss defense counsel's objections or discourage her from making appropriate objections.  Indeed, the trial court sustained the first of counsel's three objections to the prosecutor's arguments at issue.  Thus, because the record does not suggest any additional objections and/or a request for an admonition would have been futile, the prosecutorial misconduct claim is forfeited.

Even if defendant preserved the claim for appeal, we see no prejudicial prosecutorial misconduct.  Initially, we note that defendant's arguments on misconduct require clarification.  In his opening brief, he argues "the prosecutor's arguments . . . regarding manipulation, control, multiple instances of abuse, not calling police, not informing family, the victim wanting to make the relationship work, etc., were outside of the juror's

12

common knowledge and were facts outside the record." However, in his reply brief, defendant admits "it was fair game for the prosecutor to highlight Jacqueline's allegations that [he] had a pattern of apologizing to Jacqueline just as [he] did after the shooting"; "to point out that Jacqueline testified she did not tell her family about the alleged prior abuse because she wanted her family to like [him]"; and "to characterize [him] as being 'manipulative' and 'controlling.' "

Thus, as we understand it, defendant's argument does not challenge the prosecutor's references to the 2017 domestic violence incidents or her descriptions of those incidents as evincing a pattern of his manipulation and control. Rather, as defendant distils it in his reply brief, his claim is that prosecutor crossed the line into impermissible argument when "[s]he argued that controlling and manipulating behavior of [his] . . . was what 'domestic violence, the real thing' is like compared to 'what Hollywood tells you it is.' . . . In other words, the prosecutor applied the facts of this case to common themes in *other* domestic violence cases to bolster [Jacqueline's] credibility and dispel common misconceptions about domestic violence." According to defendant, the prosecutor's comments essentially referred to the attributes of "intimate partner battering,"[5] evidence that " 'has been defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." ' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083–1084.) Defendant argues that because such evidence is admissible only through a qualified expert (Evid. Code, § 1107, subd. (a)), and no such expert testimony was presented here, the prosecutor effectively

---

[5] Previously referred to as "battered women's syndrome," the preferred terminology is now "intimate partner battering and its effects." (Evid. Code, § 1107, subd. (f).)

13

acted as an expert witness without being subject to cross-examination. Defendant maintains he thereby was deprived of his due process right to a fair trial.

The People counter that the prosecutor did not refer to attributes of intimate partner battering because she did not make any claims about what domestic violence victims "often" do or discuss any psychological or scientific theories of domestic violence. Instead, they assert the prosecutor "simply argued that Jacqueline was a victim of domestic violence even though her experience was not like Hollywood depictions of domestic violence"—i.e., "that truth is different from fiction." The People contend this argument was proper, relying on the principle that a prosecutor may state facts not in evidence in argument unless those facts "are 'matters of common knowledge or illustrations drawn from experience, history, or literature.' [Citations.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 463; accord, *People v. Harrison, supra,* 35 Cal.4th at p. 248.)

On one hand, the prosecutor's references to common misconceptions of domestic violence victims portrayed in "Hollywood" arguably touched upon some aspects of "intimate partner battering"—a matter that is not limited to matters of common knowledge or an illustration drawn from common experience. In fact, Evidence Code section 1107 provides for the introduction of expert testimony to dispel common misconceptions about domestic violence victims. (Evid. Code, § 1107, subd. (a); see *People v. Riggs* (2008) 44 Cal.4th 248, 293 [expert testimony on intimate partner battering is admissible "to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand"].) On the other hand, the prosecutor's remarks, when considered in the context of her entire argument, expressed the broad concept that "real-life situations

14

are not the same as fictional depictions," an argument that clearly draws from common experience.

We need not decide whether the prosecutor's comments amounted to misconduct because any such misconduct was harmless. There was overwhelming evidence of defendant's intent to kill. (See *People v. Perez* (2010) 50 Cal.4th 222, 229 [a conviction for attempted murder requires proof that the defendant intended to kill the victim and a direct but ineffectual act toward accomplishing that goal].) The evidence shows that defendant knew the gun was loaded when he shot Jacqueline. As Deputy Quiapo testified, Jacqueline told him that defendant placed a bullet in the chamber of the gun when he was in the bedroom moments before he shot her. Jacqueline also testified that she knew there was at least one bullet in the chamber. Defendant then pointed the loaded gun at Jacqueline's chest from about eight feet away and pulled the trigger multiple times until the gun finally fired and the bullet struck her. It is well settled that the "very act of discharging a lethal firearm at [a person] from close range ' "in a manner that could have inflicted a mortal wound" ' [citation] is itself evidence sufficient to support an inference of intent to kill." (*People v. Smith* (2005) 37 Cal.4th 733, 742; *People v. Houston* (2012) 54 Cal.4th 1186, 1218.)

Defendant nonetheless asserts that the prosecutor's misconduct was prejudicial because this case was "closely balanced" on the question of intent to kill. Specifically, he claims, "Some of the strongest evidence to negate the intent-to-kill element" were his statements immediately after the shooting that he did not believe he had shot Jacqueline and, upon realizing that he did shoot, that he was sorry. He argues that the prosecutor "undermined the defense's use of the apology after the shooting to negate the evidence of intent to kill," because she "put the prior apologies" that defendant made in

15

connection with the 2017 domestic violence incidents "in the context of the control and manipulation . . . ." Put differently, defendant complains that the prosecutor's arguments suggested that his "apology on the night of the shooting was just part of a pattern."

We are not persuaded. A premise of defendant's prejudice argument is that it was improper for the prosecutor to argue that "the prior apologies were . . . just part of [his] purported control and manipulation." However, as noted above, any such argument has been repudiated by defendant's acknowledgment in his reply brief that "it was fair game for the prosecutor to highlight Jacqueline's allegations that [he] had a pattern of apologizing to Jacqueline just as [he] did after the shooting" and "to characterize [him] as being 'manipulative' and 'controlling.'" Instead, his claim of prosecutorial misconduct is based specifically on the prosecutor's purported comparison of this case and "Hollywood" or "other domestic violence cases," which his prejudice argument does not appear to address.

Defendant's prejudice argument also relies on the premise that his apology after the shooting was "[s]ome of the strongest evidence to negate the intent-to-kill element." But he does not explain exactly how this is so. Presumably, defendant's argument is based on his primary trial theory that his apology was evidence that the shooting "was just an accident," and therefore he lacked the requisite intent to kill. We find such a theory tenuous. For one, it is questionable whether defendant's *after-the-fact* remarks established his intent *at the time he shot Jacqueline.* But even if they were probative of his intent at the time of the shooting, defendant's apologies afterwards do not necessarily disclaim an intent to kill. There is no one meaning of "apology," which is defined variously as: "1. An acknowledgment expressing regret or asking pardon for a fault or

16

offense . . . .  [¶]  2.a. A formal justification or defense.  [¶]  b. An explanation or excuse" (The American Heritage Dict. (5th ed. 2022) <https://ahdictionary.com/word/search/html?q=apology> (as of Nov 8, 2022); see also *People v. Livaditis* (1992) 2 Cal.4th 759, 784 ["A statement, for example, that the defendant is sorry . . . admits guilt but also expresses remorse"].)  Because an "apology" can encompass statements that express responsibility for wrongdoing, remorse, a justification or excuse for complicity, or none of these, it does not necessarily follow that the jury would have interpreted defendant's apologies after the shooting as exculpatory.[6]  In any event, the jury's true findings on the enhancement allegations that defendant intentionally discharged the firearm (§ 12022.53, subds. (c), (d)) suggest that it rejected his argument that the shooting was accidental.  Thus, we disagree with defendant that the issue of intent to kill was "closely balanced."

Additionally, assuming the prosecutor's reference to "Hollywood's version of domestic violence" was improper, the trial court instructed the jury that "[n]othing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discussed the case, but their remarks are not evidence. . . .  Only the witness'[s] answers are evidence." We presume the jurors understood and followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Given that the evidence supporting the verdict was strong, the evidence supporting a different outcome was comparatively weak, and the jury was instructed that the attorneys' arguments were not evidence, any argument that the jury likely would have rendered a verdict in favor of defendant but

---

[6] This is especially true given that the jury heard evidence of defendant's other conduct after the shooting (such as that he left Jacqueline in a parking lot and fled) and was instructed that it could consider such evidence as consciousness of guilt.

17

for the prosecutor's arguments is without merit.  We therefore conclude that any misconduct on the part of the prosecutor was harmless.[7]

### Defendant Forfeited His Claim of Prosecutorial Misconduct Based on Misstatements of the Law, and His Alternative Claim of Ineffective Assistance Fails

In his second argument attacking his attempted murder conviction, defendant asserts the prosecutor committed misconduct by misstating the law on voluntary intoxication in closing argument.

### *Additional Background*

The trial court instructed the jury on voluntary intoxication using CALCRIM No. 3426, which states: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with the intent to kill or the attempted murder was done willfully, and with deliberation and premeditation.

"A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"In connection with the charge of attempted murder as charged in Count 1, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to kill Jacqueline . . . .  If the People have not met this burden, you must find the defendant not guilty of

---

[7] Defendant's alternative claim of ineffective assistance of counsel fails for the same reason. "Ineffective assistance of counsel under the Sixth Amendment entails deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of a reasonable probability of a more favorable outcome in the absence of the deficient performance." (*People v. Cole, supra,* 33 Cal.4th at p. 1202, fn. 11, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–696 (*Strickland*).)  Because we conclude that any prosecutorial misconduct was harmless, defendant cannot meet his burden of showing a reasonable probability of a different outcome had defense counsel made a timely objection.  His claim of ineffective assistance of counsel thus fails.

18

attempted murder as charged in Count 1. [¶] . . . [¶]

"You may not consider evidence of voluntary intoxication for any other purpose. . . ."

In the prosecutor's rebuttal argument, she referred to CALCRIM No. 3426 and commented: "It only applies to Count 1, which is the attempted murder. And basically what it says is that if the defendant was so intoxicated—was intoxicating to the point he couldn't form the mental intent that's needed for the crime, then you can't find him guilty. So now they are asking you to believe that the defendant was so drunk and high that he couldn't form the intent to kill. Yet, he has the complete ability to load and unload a firearm. He has the ability to drive a vehicle. He has the wherewith all [*sic*] to know to hang up the phone after he's called 911 realizing he's going to get in trouble. He recognizes that he needs to get out of the McDonald's parking lot before law enforcement comes. So all these things and they are asking you to believe he is so intoxicated and so drunk that he can't form the intent to kill. Grasping for straws here, guys. "

### *Analysis*

Defendant contends the prosecutor misstated the law when she informed the jury that it could consider the effect of voluntary intoxication on defendant's *capacity* to form the intent to kill. Since evidence of voluntary intoxication was admissible solely on the issue of whether he *actually* formed the requisite intent (§ 29.4, subds. (a), (b)), defendant asserts that the misstatement lowered the prosecutor's burden of proof on the issue of intent.

As a preliminary matter, defendant acknowledges that counsel did not object to the prosecutor's arguments or ask for the jury to be admonished.

19

Accordingly, any claim of prosecutorial misconduct is forfeited.[8] (*Covarrubias*, *supra*, 1 Cal.5th at p. 894.)

Defendant alternatively argues that if the claim was forfeited, then his counsel was ineffective for failing to object. In *People v. Mackey* (2015) 233 Cal.App.4th 32, 119 (*Mackey*), we summarized the well-established standard for a successful ineffective assistance of counsel claim: "A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland*[, *supra*,] 466 U.S. [at pp.] 687, 691–692]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) On the first prong he must show that 'counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms.' (*Strickland*, *supra*, at p. 688.) And under the second, he must show that in the absence of the error it is reasonably probable that a result more favorable to him would have been obtained. A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.' (*Id.* at p. 694.)" Where defendant fails to show prejudice, we may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (*Id.* at p. 697.)

"To establish that his trial counsel's performance fell below an objective standard of reasonableness, [defendant] must first show prosecutorial misconduct." (*People v. Morales* (2021) 67 Cal.App.5th 326, 338.) As noted, defendant argues that the prosecutor misstated the law on voluntary intoxication by asking the jury to consider the effect of defendant's voluntary intoxication on his *capacity* to form the requisite intent, as opposed to whether he *actually* formed such intent. (See § 29.4, subd. (a) ["Evidence of

---

[8] We will deal with the issue of the prosecutor's misstatement of the law in the context of defendant's claim of ineffective assistance.

20

voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged . . ."]; *id.*, subd. (b) ["Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent . . ."]; see also *People v. Saille* (1991) 54 Cal.3d 1103, 1119 ["Intoxication is now relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state"].) The People acknowledge that the prosecutor's statement of the law was "imprecise." We agree with defendant that the prosecutor's comments were inappropriate in light of section 29.4 and decisional law on voluntary intoxication.

Nonetheless, we need not decide whether the prosecutor's comments rose to the level of misconduct—or, by extension, whether counsel's failure to object fell below an objective standard of reasonableness—because defendant's claim fails for lack of prejudice.

As the People assert, *People v. Forrest* (2017) 7 Cal.App.5th 1074 (*Forrest*) is on point. There, the prosecutor in closing argument told the jury that it could consider the effect of voluntary intoxication on appellant's *capacity* to premeditate, deliberate, and harbor express malice.[9] (*Id.* at p. 1082 & fn. 8.) The appellate court found the arguments "somewhat misleading" but did not expressly conclude they amounted to misconduct. Notwithstanding those arguments, the court explained that the prosecutor

---

[9] "Specifically, the prosecutor argued . . . : 'The only issue with alcohol is was he *able* to have a goal and think about how to obtain that goal or did alcohol stop him from being able to do that. [¶] Was he *unable* to form the intent to kill? [¶] That's the *only thing* that alcohol goes to. [¶] . . . [¶] You can consider [voluntary intoxication] as to specific intent and premeditation during deliberation; that's it. [¶] And by "consider," it doesn't mean, oh, he drank a whole bunch of alcohol so the alcohol caused him to kill. No. That's not what that is talking about. [¶] . . . [¶] But the question is: Did alcohol stop the defendant from being *able* to form intent to kill or premeditation and deliberation? Did it stop him from being *able* to be goal-oriented? [¶] So it's not was he over the legal limit for driving? There are functioning alcoholics. [¶] The issue is: Was he *capable* to form that intent?' " (*Forrest*, at p. 1082, fn. 8.)

21

appropriately emphasized the evidence showing that despite the defendant's voluntary intoxication, he actually had the requisite mental state for first degree murder.  (*Id.* at pp. 1082–1083.)

The *Forrest* court went on to hold that assuming the prosecutor misstated the law, the misstatement was harmless.  (*Forrest*, *supra*, 7 Cal.App.5th at p. 1083.)  It first noted that "[t]he trial court fully and correctly instructed the jury on the significance of voluntary intoxication, stating that the jury could consider evidence of voluntary intoxication 'only in a limited way,' to decide 'whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation,' and the jury 'may not consider evidence of voluntary intoxication for any other purpose.' " (*Ibid.*)  The jury also was instructed that it must follow the court's instructions if any of the attorneys' comments conflicted with the jury instructions given.  (*Ibid.*)  Additionally, "the evidence . . . that [defendant] had the requisite mental state for first degree murder was overwhelming, whereas the evidence of the [defendant's] intoxication at the time of the killing—consisting of his own testimony that he was drinking that night and the presence of empty containers of alcohol around the house—was extremely weak." (*Ibid.*)  Given the state of the evidence, the court did "not find any diminution of the prosecution's burden of proof on the issue of [defendant's] intent" and thus deemed harmless any misstatement of the law by the prosecutor regarding voluntary intoxication.  (*Ibid.*)

Likewise here.  The trial court here instructed the jury that it must consider evidence of voluntary intoxication "only in a limited way" to decide "whether the defendant acted with the intent to kill," and that it "may not consider evidence of voluntary intoxication for any other purpose."  The court also instructed the jury that it must abide by the court's instructions if any of

the attorneys' comments conflicted with the jury instructions given. Moreover, as in *Forrest*, the evidence that defendant had the mental state for attempted murder "was overwhelming" for reasons discussed above, whereas evidence of his intoxication was weak. While there was evidence that he drank almost two bottles of beer and smoked an unknown quantity of marijuana, there was no evidence on the actual degree of intoxication, much less that his intoxication affected his intent in any way. Under these circumstances, the prosecutor's remarks on voluntary intoxication were not likely to prejudice defendant. As such, the ineffective assistance of counsel fails.

### The Trial Court Properly Declined to Instruct the Jury on the Defense of Accident

Defendant's third attack on his attempted murder conviction is that the trial court erred in denying his request to instruct the jury on the defense of accident.

### *Additional Background*

As noted, a primary defense theory at trial was that defendant accidentally shot Jacqueline. In pursuing this theory, counsel requested that the trial court instruct the jury with CALCRIM No. 3404, which provides: "The defendant is not guilty of [attempted murder] if [he] acted . . . without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of [attempted murder] unless you are convicted beyond a reasonable doubt that [he] acted with the required intent."

The prosecutor argued against giving that instruction because "[t]here [was] no evidence whatsoever to suggest that an accident occurred." The prosecutor then cited to section 26, which describes the statutory defense of accident, as follows: "All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Five—Persons who

23

committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." The prosecutor asserted that because the evidence showed, at a minimum, defendant was culpably negligent, CALCRIM No. 3404 was inapplicable.

The trial court agreed with the prosecutor, stating it "couldn't discern any evidence that would suggest this is an accident" and "[i]t is clear that it rises at least to the level of negligence . . . ." It explained that "based on the evidence, [defendant] knows it's got at least one round in the cylinder, doesn't know if it's in the chamber or not. That, to me at least, is a negligent act." The court thereby declined to instruct the jury with CALCRIM No. 3404.

### *Analysis*

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) But " 'when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking sua sponte instructional duties. While a court may well have a duty to give a "pinpoint" instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such "pinpoint" instructions are not required to be given sua sponte and must be given only upon request.' " (*People v. Saille, supra,* 54 Cal.3d at p. 1117, italics omitted.) CALCRIM No. 3404 is a "pinpoint" instruction that is not required to be given sua sponte. (See *People v. Anderson* (2011) 51 Cal.4th 989, 997–998 (*Anderson*).)

"[O]n request, a criminal defendant is entitled to pinpoint

24

instructions . . . if the instructions are supported by substantial evidence." (*People v. Nelson* (2016) 1 Cal.5th 513, 542.) When reviewing the denial of a request for a jury instruction, doubts as to the sufficiency of the evidence are resolved in favor of the accused. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) In doing so, we do not weigh the credibility of the witnesses, and we focus on matters that could justify the instruction rather than the "customary summary of evidence supporting the judgment." (*People v. King* (1978) 22 Cal.3d 12, 15–16.) However, when the evidence is "minimal and insubstantial . . . , the court need not instruct on its effect." (*People v. Flannel* (1979) 25 Cal.3d 668, 684–685, superseded by statute on other grounds as stated in *People v. Elmore* (2014) 59 Cal.4th 121, 138.) As our Supreme Court has cautioned, "unsupported theories should not be presented to the jury" and "[t]rial courts have the duty to screen out invalid theories of conviction, either by appropriate instruction or by not presenting them to the jury in the first place." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131.)

Defendant contends the trial court erred in denying his request to instruct the jury on accident, partly on the basis that it "misunderstood what was legally required to warrant the instruction" by considering whether there was evidence of his negligence. He cites to *People v. Lara* (1996) 44 Cal.App.4th 102, 110, which states, "If the crime charged requires general [or specific] criminal intent, then the [accident] should apply to acts committed 'through misfortune or by accident, when it appears there was no . . . [general or specific intent] . . . ,' (§ 26, subd. Five) *regardless of whether the defendant was criminally negligent*. [¶] Where, as here, the defendant is charged with a general [or specific] intent crime, instruction on 'criminal negligence' [or 'culpable negligence'] is erroneous." (Italics added.) The People concede the point but argue that that the court's reasoning is

25

irrelevant, given that "appellate courts review decisions, not reasoning, and a correct decision should not be overturned merely because it was reached for the wrong reason." (Citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.) Here, the People assert, the pertinent question is "whether there was substantial evidence that [defendant] accidentally shot Jacqueline." And they say, "There was not."

Assuming defendant is correct that the court's decision not to give the jury CALCRIM No. 3404 rested in part on flawed legal reasoning, we may nonetheless affirm its decision if it is correct on any ground. (*D'Amico v. Board of Medical Examiners, supra,* 11 Cal.3d at p. 19; *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12, citing *People v. Geier* (2007) 41 Cal.4th 555, 582.) Therefore, we address whether the defense theory of accident is supported by substantial evidence. (*People v. Nelson, supra,* 1 Cal.5th at p. 542.) And conclude it was not.

Defendant appears to assert four theories of accident: first, he did not know that the gun was loaded; second, even if he did know, he "miscalculated as to when the round would be in the chamber to be fired"; third, "he may have planned on shooting at a target near Jacqueline"; and fourth, his remarks immediately after the shooting indicate he did not plan on Jacqueline getting shot.

Concerning the first theory, defendant admits that the court's finding that "[defendant] knew there was at least one round in the cylinder of the gun" "certainly was one interpretation of the evidence." Indeed, defendant acknowledges Deputy Quiapo's testimony that Jacqueline reported she saw defendant put a bullet in the chamber of the gun in the bedroom before he shot her. In addition, Deputy Quiapo testified that a person firing defendant's revolver would be able to tell if a bullet was inside the revolver.

26

Nevertheless, defendant contends "the evidence could be viewed as at least ambiguous as to whether [he] knew the gun was loaded" because "Jacqueline testified inconsistently and vaguely about how the gun became loaded." Defendant provides several examples in claimed support, but none of them is persuasive. For instance, he points out that when asked whether she was aware that there was a bullet in the gun, Jacqueline testified, "I don't remember . . . . I just know—I remember—yeah, yeah, he did" and "[h]e had a bullet in there." While Jacqueline's testimony may have reflected a momentary lack of recollection, we do not think it can be fairly read as creating an ambiguity or conflict in the evidence concerning whether defendant was aware the gun was loaded prior to shooting her.

Defendant's second theory of accident is that he "miscalculated as to when the round would be in the chamber to be fired." This theory, too, fails. As described above, the evidence showed that defendant placed at least one live bullet in the chamber of the revolver. Then, from about eight feet away, defendant pointed the gun at Jacqueline's chest and pulled the trigger multiple times until a bullet was discharged. There is no evidence that defendant made any effort to ascertain the position of the bullet in the chamber before pulling the trigger multiple times. Based on defendant's actions, he cannot viably argue he "had not foreseen or planned on Jacqueline getting shot." (Cf. *People v. Jones* (1991) 234 Cal.App.3d 1303, 1314, disapproved on another ground in *Anderson, supra*, 51 Cal.4th at p. 998, fn. 3 [defense of accident available on attempted charge where evidence showed defendant pointed a shotgun at officer but did not intend to fire it; the shotgun discharged as the officer attempted to knock it aside].)

Defendant's third theory of accident is that he "may have planned on shooting at a target near Jacqueline." There is no evidence to support this

27

theory. In fact, the evidence is to the contrary: at the time of the shooting, defendant pointed a gun at Jacqueline's chest and the gunshot wounds in her torso area reflected that.

Likewise unavailing is defendant's fourth theory of accident, which is that his statements "I didn't hit you," followed by "I'm sorry," after the shooting tended to show he had shot Jacqueline accidentally. For the reasons already discussed above, we find the cogency of this theory to be weak.

Accordingly, we conclude the evidence supporting defendant's theory that the shot was accidental was "minimal and insubstantial." (*People v. Flannel, supra,* 25 Cal.3d at pp. 684–685.) It follows that the trial court did not err in denying the request to give the jury CALCRIM No. 3404.

For similar reasons, even if omission of the accident instruction was error, it was harmless.[10] Evidence against defendant was strong, whereas evidence of his accident defense was weak. Also, as previously noted, the jury's true findings on the enhancements under section 12022.53, subdivisions (c) and (d) suggest that it did not believe that the shooting was an accident. In short, even if the jury had been instructed with CALCRIM No. 3404, we are not persuaded that it would have reached a verdict favorable to defendant.

### Trial Counsel Was Not Ineffective in Failing to Request CALCRIM No. 358

Defendant next asserts that his trial attorney was ineffective for failing to request CALCRIM No. 358, which would have instructed the jury with the

---

[10] Defendant contends we should apply the *Chapman* harmless error standard in assessing prejudice, while the People assert we should apply the *Watson* prejudice standard. We agree with the People. CALCRIM No. 3404 does not delineate or describe an element of an offense. Rather, it is a pinpoint instruction relating particular facts to a legal issue in the case. (See *Anderson, supra,* 51 Cal.4th at pp. 997–998.) And our Supreme Court has held that the erroneous failure to give a pinpoint instruction is reviewed for prejudice under the *Watson* harmless error standard. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1111–1112; *People v. Wharton* (1991) 53 Cal.3d 522, 571 & fn. 10.) In any event, we would conclude that any instructional error was harmless under either standard.

28

following:

"You have heard evidence that the defendant made oral statements. You must decide whether the defendant made any of these statements, in whole or in part. If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statements. [¶] [*Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.*]" (Italics added.)

The purpose of the bracketed language in CALCRIM No. 358 is "to aid the jury in evaluating whether the defendant actually made the statement." (*People v. Diaz* (2015) 60 Cal.4th 1176, 1184 (*Diaz*).) It "is concerned with the reliability and credibility of the witness who testifies about the defendant's statements." (*Id.* at p. 1187.)

Historically, trial courts had a sua sponte obligation to give the instruction. (*Diaz, supra*, 60 Cal.4th at pp. 1188–1189.) By the time of defendant's trial, however, the California Supreme Court had discarded this sua sponte duty. (*Ibid.*) The Supreme Court in *Diaz* reached this conclusion, in part, because jurors must now be instructed with the "general instructions on witness credibility" (CALCRIM No. 226). (*Diaz, supra*, 60 Cal.4th at pp. 1189, 1191.) The court also concluded that a defendant should be allowed to decide whether the instruction would be in his or her interests, rather than require the trial judge to give the instruction in every case, since such oral statements may sometimes include "both incriminating and exculpatory elements." (*Id.* at p. 1193.)

Thus, if defendant wanted the jury instructed with CALCRIM No. 358, his trial counsel had to request it. She did not. Her failure to do so,

defendant asserts, rendered counsel's performance prejudicially deficient.

As noted above, a defendant claiming ineffective assistance of counsel is required to prove both deficient performance and resulting prejudice. (*Mackey, supra,* 233 Cal.App.4th at p. 119, citing *Strickland, supra,* 466 U.S. at pp. 687–688, 691–692, 694.)  Defendant has not shown either prong.

As to the first prong, defendant argues, "one of defense counsel's strongest arguments to defeat the intent-to-kill element was [his] repeated apology when he realized that he had actually shot Jacqueline.  [Citations.] However, the impact of that exculpatory evidence was watered down by Jacqueline's incriminatory testimony that [he] had apologized in a similar fashion immediate after prior acts of domestic violence."  Thus, defendant contends, "Had CALCRIM No. 358 been requested, the jury would have known to view Jacqueline's testimony of the incriminating prior apologies with caution."[11]  He then concludes that counsel's failure to ask for the cautionary instruction "fell below an objective standard of reasonableness . . . ."

We disagree.  Although the record does not show why counsel did not request the court to give the jury CALCRIM No. 358, we discern potential tactical reasons for her refraining to do so.  (See *People v. Weaver* (2001) 26 Cal.4th 876, 926 ["[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective

---

[11] In discussing the "[r]elevant [p]roceedings" relating to the omission of CALCRIM No. 358, defendant also recounts Jacqueline's testimony that he sang to her song lyrics about killing a girl, stated they "were going to play a little game" before shooting her, and told her "stuff like to remember" while riding in defendant's car after the shooting.  However, defendant does not raise such evidence in connection with his argument that counsel's performance was deficient.  Although he does mention that evidence in his discussion of prejudice, the extent of his argument is that CALCRIM No. 358 "would have been helpful by instructing the jury to view with caution" those statements.  This argument is a "general assertion, unsupported by specific argument," allowing us to treat is as waived.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)  The conclusory and speculative nature of the argument is also insufficient to support an ineffective assistance of counsel claim.  (See *Strickland, supra,* 466 U.S. at pp. 693–694; *People v. Ledesma, supra,* 43 Cal.3d at p. 216.)

assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions"]; see also *People v. Lucas* (1995) 12 Cal.4th 415, 436–437 [there is a " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' "]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 [generally, a reviewing court "may not second-guess" trial counsel's strategic and tactical choices].)  As the People argue, defense counsel's decision to forgo the cautionary instruction had a conceivable strategic basis:  "[Defendant's] defense was entirely based on his out of court statements, which were introduced through the same witness as his inculpatory statements.  A reasonable defense attorney may not have wanted to risk the jury treating those statements with caution."

The People aptly cite *Diaz*, in which our Supreme Court observed, "It is not uncommon that the statements of a defendant contain both incriminating and exculpatory elements."  (*Diaz*, *supra*, 60 Cal.4th at p. 1193; see *People v. Vega* (1990) 220 Cal.App.3d 310, 317–318 ["[I]t is not uncommon that a single statement may tend to prove guilt or innocence, depending upon the state of the remaining evidence and the issue for which it is being considered"].)  Although defendant contends the jury would have understood CALCRIM No. 358 to apply only to statements proving guilt, not to exculpatory statements, *Diaz* explained, "A defendant, however, might prefer not to rely on the jury's ability to discriminate between those incriminating admissions it should view with special caution and those exculpatory statements that are not subject to the instruction.  Or a defendant might not contest that the incriminating portions of his or her statements were made, and wish to avoid any risk that the jury might apply the cautionary instruction to portions of the statements that he or she wanted the jury to accept."  (*Diaz*, *supra*, 60 Cal.4th at p. 1193.)

Further, the bracketed cautionary language of CALCRIM No. 358 is intended primarily for circumstances where there is a question whether the defendant in fact made the statement at issue. (*Diaz*, *supra*, 60 Cal.4th at p. 1185.) Where, as here, there was no evidence contradicting Jacqueline's testimony that defendant made the statements of apologies in connection with the prior incidents of domestic violence, the cautionary language is arguably inapposite, and it would therefore be reasonable for defense counsel to decline to request it.

In addition, defendant has not demonstrated the second prong of prejudice to support his ineffective assistance of counsel claim. Even before *Diaz* changed the law by discarding the trial court's duty to sua sponte give such the cautionary instruction to out of court statements, its erroneous omission had "frequently been held to be harmless error in light of such general instructions on witness credibility," such as CALCRIM No. 226. (*Diaz*, *supra*, 60 Cal.4th at pp. 1191, 1196–1197.) Here, the jury was instructed with CALCRIM No. 226 and therefore informed "of the need to evaluate the witnesses' testimony for possible inaccuracies and determine whether the statement was in fact made." (*Diaz*, at p. 1196.)

Another basis for finding any instructional error harmless is the lack of conflict in the evidence as to whether defendant made the oral statements, as mentioned above. " 'Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the [statements] were repeated accurately.' [Citation.]" (*Diaz*, *supra*, 60 Cal.4th at p. 1195–1196 [finding harmless omission of cautionary instruction in part where witnesses'

testimony concerning the out of court statements was generally consistent and thus would not "cause a jury to question whether the statements were actually made"], citing *People v. Dickey* (2005) 35 Cal.4th 884, 906 [" 'Where there was no such conflict in the evidence, but simply a denial by the defendant that he made the statements attributed to him, we have found failure to give the cautionary instruction harmless' "]; accord, *People v. McKinnon* (2011) 52 Cal.4th 610, 680; *People v. Stankewitz* (1990) 51 Cal.3d 72, 94.)  Here, there was no direct evidence calling into question the accuracy of the statements attributed to defendant.

On top of all that, we have repeatedly discussed that there was ample evidence of defendant's intent to kill.  Having reviewed the evidence, including defendant's out of court statements, we conclude that defendant was not prejudiced by the failure of defense counsel to request a cautionary instruction.

In sum, because counsel's performance on this issue was reasonable and defendant suffered no prejudice from it, counsel did not render ineffective assistance.

**There Was No Cumulative Error**

Defendant next asserts that his attempted murder conviction must be reversed because the trial court's errors combined to deprive him of his due process right to a fair trial.  To the extent that there are instances in which we assumed the existence of error, we concluded that no prejudice resulted from any such error.  When considered cumulatively, those assumed errors provide no basis for reversal.  (See *People v. Potts* (2019) 6 Cal.5th 1012, 1058; *People v. Rogers* (2006) 39 Cal.4th 826, 911.)

**The Trial Court Had No Sua Sponte Duty to Modify the Instruction on Assault**

Finally, we turn to defendant's sole challenge to his conviction of

33

assault with a firearm as charged in count three.

The trial court in this case instructed the jury with CALCRIM No. 875, which states, in relevant part: "To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to *a person*; [¶] . . . [¶]

"2. The defendant did that act willfully;

"3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force *to someone*;

"AND

"4. When the defendant acted, he had the present ability to apply force with a firearm *to a person*." (Italics added.)

Three counts of assault with a firearm were charged, two of which identified Jacqueline as the victim (counts two and four), and the third count identifying their daughter as the victim (count three). Defendant challenges his conviction as to count three. Relying on *People v. Velasquez* (2012) 211 Cal.App.4th 1170 (*Velasquez*), defendant argues that while CALCRIM No. 875 was a correct statement of the law, the trial court had a sua sponte duty to give an instruction that clarified the requirement that each victim must have been subject to the application of force. He asserts that CALCRIM No. 875's reference to a "person" and "someone," rather than to the victim by name, might have misled the jury to believe the prosecutor was not required to prove defendant's shooting Jacqueline would directly and probably result in application of force to his daughter.[12]

---

[12] The People assert this issue was forfeited due to defense counsel's failure to object to the instruction. We have nonetheless addressed the issue because of its potential bearing on defendant's substantial rights. (See *Velasquez*, *supra*, 211 Cal.App.4th at p. 1177, fn. 5.)

In *Velasquez*, the defendant in a drive-by shooting fired a gun 10 times at the garage of a residence occupied by a family of five. (*Velasquez*, *supra*, 211 Cal.App.4th at p. 1175.) At the time of the shooting, only one member of the family (Maria) was in the garage, while the others were in other rooms of the house. (*Ibid.*) The defendant was convicted of five counts of assault with a firearm, one for each of the five family members in the residence. (*Ibid.*) On appeal, the defendant contended the four counts (other than as to Maria) had to be reversed because the standard version of CALCRIM No. 875 improperly allowed the jury to convict defendant of those counts simply because Maria was at risk of being struck by a bullet. (*Velasquez*, at p. 1175.)

The appellate court agreed and reversed the defendant's convictions on all counts of assault with a firearm except the one identifying Maria. (*Velasquez*, *supra*, 211 Cal.App.4th at p. 1178.) The court reasoned that the standard version of CALCRIM No. 875 created juror confusion under the facts applicable to the case such that the jury could have convicted the defendant on four or five counts of assault without proof, beyond a reasonable doubt, of each element of the offense. (*Velasquez*, at p. 1177.) In reaching its conclusion, the court posited the following hypothetical: "One cannot assault John Doe, when the defendant aimed at Tom Smith, if John Doe was standing hundreds of feet behind the defendant when the defendant shot the firearm . . . . Tom Smith was the victim of an assault because the act in this hypothetical would directly and probably result in application of force to him. But John Doe, who was hundreds of feet away in the opposite direction, unthreatened and unharmed, was not a victim of assault because the defendant did not commit an act that 'by its nature would directly and probably result in application of force' to John Doe." (*Id.* at pp. 1176–1177.)

This case is materially different. Unlike the circumstances in

35

*Velasquez*, which involved five assault victims with only one of them in the area of the shooting, here, both Jacqueline *and* the child were both in the area of the shooting.  While defendant pointed the gun at Jacqueline's chest area, she was standing right next to, and holding, her daughter's leg moments before defendant shot her from about eight feet away.  And defendant admits he fired the gun at Jacqueline even though he knew his daughter was right next to her.  To the extent defendant suggests evidence of his specific intent to injure his daughter was required to sustain the assault charge, he is mistaken.  "[A]ssault does not require the specific 'intent to cause any particular injury to severely injure another . . . .'  Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another."  (*People v. Williams* (2001) 26 Cal.4th 779, 790.)  Here, even if defendant's daughter may not have been the intended target, defendant knew of facts establishing that his act by its nature would "probably and directly result in the application of physical force against" his daughter.  Thus, unlike in *Velasquez*, the potential for juror confusion from CALCRIM No. 875, as given, was not "obvious."  (*Velasquez*, *supra*, 211 Cal.App.4th at p. 1176.)

We therefore conclude the trial court did not err in failing to modify the instruction on assault.

## DISPOSITION

The judgment is affirmed.

_____
Richman, Acting P. J.

We concur:


_____
Miller, J.


_____
Van Aken, J. *


*People v. Moran* (A165847)

     *Judge of the San Francisco Superior Court, Judge Christine Van Aken, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.